**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.: 21-CR-221** |
| | : | |
| v. | : | |
| | : | |
| **MARK BLUE** | : | **SENTENCING**: October 30, 2024 |
|     **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following memorandum to assist the Court in issuing an appropriate sentence in this case. For the reasons discussed herein, the government recommends that the Court sentence the defendant to the following terms:

- Count One: 240 months of imprisonment; five years of supervised release

- Count Two: Lifetime imprisonment

- Count Three: 216 months of imprisonment; five years of supervised release

- Count Four: 120 months of imprisonment; five years of supervised release

- Count Five: Life without Release

- Count Six: Life without Release

The government also requests that the Court order the defendant to pay $1179.00 in restitution. This sentence, which the government acknowledges is severe, is within the U.S.S.G. Sentencing Guidelines and appropriately weighs the sentencing factors under 18 U.S.C. §3553(a). In support of this recommendation, the government relies on the following points and authorities, as well as such other points and authorities as may be cited at the sentencing hearing.

1

## I.  BACKGROUND

### A.  Procedural Posture

On March 6, 2024, after a five-day jury trial, the defendant was convicted of one count of Kidnapping, in violation of 18 U.S.C. § 1201(a)(1); one count of Conspiracy to Commit Kidnapping, in violation of 18 U.S.C. § 1201(c); one count of Kidnapping while Armed, in violation of 22 D.C. §§ 2001, 4502; one count of Robbery while Armed, in violation of 22 D.C. §§ 2801, 4502; and two counts of First Degree Sexual Abuse while Armed with Aggravating Circumstances, in violation of 22 D.C. Code §§ 3002, 3020, and 4502. The Court has set a sentencing date of October 30, 2024.

### B.  Statement of Offenses

According to the evidence at trial, on December 2, 2018, the defendant, a 29-year-old man, was at a birthday party for his mother in Southeast Washington, D.C. The party was held at his sister April's apartment and attended by numerous family members, including the defendant's siblings, his girlfriend, and the father of April's children, Nick Savoy. Shortly after 11p.m., the defendant made an excuse to leave the party, claiming that he wanted to pick up more ice from a nearby convenience store.

Nick Savoy left the party with the defendant. The defendant took his girlfriend's car, drove past the convenience store, and into Maryland. As they drove, the defendant asked Mr. Savoy whether he was carrying a gun, and Mr. Savoy told him no. As the defendant drove past the Naylor Road Metro Station in Prince George's County, Maryland, he saw the victim, J.S. – a total stranger – walking down the street. The defendant shouted at J.S. out of the car window, looking for attention, but J.S. did not respond. The defendant became angry that J.S. ignored him and, after he passed her, made a U-turn.

Twenty-one-year-old J.S. was traveling home after her shift at the front desk of a hotel on the Gallaudet University campus. She took the bus to the Naylor Road Metro Station in Prince George's County, Maryland, as she always did, and started walking to her apartment, listening to music with her earbud headphones in. As she turned up the side street leading to her building, the defendant pulled up the car in front of her. The defendant got out of the car and approached her, putting a knife to her stomach and trying to make it seem as though it was a gun. The defendant ordered J.S. to give him all of her belongings and threatened to kill her. Nick Savoy then got out of the car and approached them, blocking J.S.'s path when she tried to leave. Together, the two men grabbed J.S.'s iPhone and her bag, which contained her SunTrust bank card, and then one of the men held J.S.'s arms behind her back while the other stripped off all of her clothes, leaving her naked except for her underwear. The defendant ordered J.S. to "walk home naked, bitch," but then Nick Savoy stated that they should take J.S. with them to make sure they could get the money off of her bank card. The defendant said that she "could be our little toy for the night" and the men put her in the backseat of the car.

After the men put J.S. in the backseat of the car, Nick Savoy got in the driver's seat, while the defendant got in the back seat with J.S. The defendant put J.S.'s camisole over her head so that she could not see and would not be able to identify the men. He told her that he would kill her if she tried to look at them. When J.S. told the defendant that she was on her period (so that they would not rape her), the defendant told her, "no one wants to fuck you, bitch." He then forced her head down and made her give him oral sex. He grabbed her breasts and threatened to pull out her nipple rings.

Over the next 30 minutes, the men took turns raping J.S., both orally and vaginally, with the camisole over her head the entire time. The defendant continually threatened to shoot or kill

3

J.S. and told her that she would "die tonight." J.S. begged him not to kill her, saying she was just trying to get home to her son.

Nick Savoy drove down a side street near J.S.'s apartment in Maryland. The defendant told him to stop, and the men got J.S. out of the car. The defendant vaginally raped J.S. from behind over the back of the car.[1] The men then put J.S. back into the back seat of the car, with the defendant driving and Nick Savoy in the backseat with J.S. Nick Savoy made J.S. give him oral sex and then vaginally raped her.

While Nick Savoy was sexually assaulting J.S. in the back seat, the defendant drove to the SunTrust bank in Anacostia, D.C. The defendant told J.S. to give them her PIN number or they would kill her. She complied. The defendant scrolled through the photos in J.S.'s phone, making crude comments, telling her at one point something to the effect of, "if you weren't my target tonight, I'd make you wifey."

At the SunTrust bank, the defendant told Nick Savoy to get out of the car and get the money from J.S.'s account. When Nick Savoy got out of the car, the defendant ordered J.S. to get in the front seat and again forced her to give him oral sex. He held the knife to her throat while she did so. He told her that if she had given them the wrong PIN number, he would kill her. He also mocked her, asking her whether he or Nick Savoy was "better" and which one had a bigger penis.

Nick Savoy took $180 from J.S.'s account – nearly all that she had. When he got back in the car, the defendant drove to a nearby alley behind Anacostia High School. The men got J.S. out of the car and sexually assaulted her at the same time, with the defendant vaginally raping her from behind while Nick Savoy forced her to give him oral sex. The men then poured Pepsi over J.S. as she stood in the alley naked, with the camisole still over her head, and wiped her down with her

---

[1] J.S. believes that both men may have taken turns raping her outside of the car in Maryland.

4

shirt, including in and around her vagina, in order to remove any DNA that they had left on her body. Nick Savoy then walked J.S. over to a fence that ran along one side of the alley and told her to count to 10 before taking the shirt off, otherwise they would kill her.

Nick Savoy got back in the car and the men drove back to the party at April Blue's apartment. The defendant told Nick Savoy not to tell anyone what they had done and ordered him to "take it to the grave."

When the defendant learned that a warrant had been issued for his arrest, he reached out to a woman he had been talking to on Facebook who lived in North Carolina and said that he wanted to visit her. He then fled to North Carolina. When he arrived, the defendant destroyed his cell phone so that he could not be tracked. The defendant did not tell the woman that he was wanted for kidnapping and rape in D.C and Maryland. When she learned about the active arrest warrant from her mother, who had seen the defendant on the news, the defendant told her that he was "just the driver" and he had only robbed a girl with a knife.  The defendant was arrested by the U.S. Marshals the following day.

## II.   SENTENCING GUIDELINES

The government agrees with the estimated sentencing guidelines set forth in the Draft Presentence Report.[2] With respect to the federal offenses, the defendant's final offense level is 40,

---

[2] At the time the government's sentencing memorandum was due, the Probation Office had not issued its Final Presentence Report. However, the government did not receive any corrections to the Draft Presentence Report from the defense.

As noted in its Objections to the Draft Presentence Report, the government disagreed with the D.C. criminal history points assigned by the Probation Office to two of the defendant's convictions; however, this did not affect the final D.C. criminal history category, which the government agrees is category D.

his criminal history category is IV, and his estimated guidelines range is 360 months – life. His sentencing guidelines under the D.C. Voluntary Sentencing Guidelines are:

- 126—216 months of incarceration on Count Three, Kidnapping while Armed

- 72 months—120 months on Count Four, Robbery while Armed; and

- 180 months to life without release on Counts Five and Six, First Degree Sexual Abuse while Armed with Aggravating Circumstances.

### III.   GOVERNMENT'S RECOMMENDATION

####   A.   Application of the Federal Sentencing Guidelines

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1). *Booker*, 125 S. Ct. at 756.

In post-*Booker* cases, the Supreme Court has stated that a district court should begin all sentencing proceedings by correctly calculating the applicable guidelines range. *See United States v. Gall*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18

U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

      B.      Basis for the Government's Recommendation

The government submits that the following terms are appropriate and warranted in the present case:

- Count One: 240 months of imprisonment; five years of supervised release
- Count Two: Lifetime imprisonment
- Count Three: 216 months of imprisonment; five years of supervised release
- Count Four: 120 months of imprisonment; five years of supervised release
- Count Five: Life without Release
- Count Six: Life without Release

The government does not make this recommendation lightly. However, the defendant does not merit a sentence outside the Guidelines, given his horrific conduct, prior criminal history, demonstrated lack of remorse, and continued attempts to lie about the offense. And, as discussed herein, the 18 U.S.C. § 3553(a) factors each support a Guidelines-compliant sentence of lifetime incarceration.

      *1.*      *The Nature and Circumstances of the Offense*

The defendant's crimes warrant the maximum sentence. His conduct was horrific and demonstrated an utter lack of humanity. He grabbed a young woman from the side of the road, robbed her, repeatedly raped her, and then discarded her, like she was a piece of trash. He violated her body in multiple ways, multiple times. Even when he finished orally and vaginally raping her,

he continued to humiliate her, pouring Pepsi on her naked body in order to destroy any evidence of his crimes. In short, the defendant did not view J.S. as a person; she was just an object for him to use for his sexual gratification.

The defendant's kidnapping and sexual assaults of J.S., standing alone, are deserving of the most serious punishment. The mental torment he inflicted upon J.S. during the physical assaults, however, renders his conduct even more depraved. He repeatedly threatened to kill her, telling her that she was going to die. He mocked her, asking her which of the men raping her was "bigger" and which was "better." He taunted her, claiming that she "liked it" when he raped her. He invaded her privacy, going through the personal photos on her phone and commenting on them. His treatment of J.S. created an additional element of terror and humiliation, even beyond the hands-on sexual abuse, and show that he felt not the slightest guilt or shame about what he was doing to her.

Moreover, it is clear from the evidence presented at trial that the defendant was both the initiator of the attack on J.S. that night and the more violent of the two men. It was the defendant who chose to rob J.S. after she "ignored" him. He decided that J.S. would be the men's "toy" and initiated the sexual assaults. He used a weapon against J.S. and repeatedly threatened to kill her so that she would comply with his demands. J.S. has been consistent since her first interview that "red coat" – i.e., the defendant – was the "aggressive one" of the two men, describing him as the man who repeatedly threatened and mocked her.

As the Court saw at trial, the defendant's offense did not end when he and Nick Savoy finally dumped J.S. in the alley behind Anacostia High School. His conduct over those sixty minutes cast a shadow over J.S.'s life that persists today. She quit the job that she relied upon as a single mother. Her relationships with her family members, including her son, were damaged. Even

years after the offense, she is still suffering from the fear, humiliation, and shame caused by the defendant's conduct – all of which she then had to relive in preparation for trial. The defendant's offense devastated J.S.'s life and caused long-lasting harm – harm that the defendant, to this day, has failed to acknowledge and for which he has failed to accept responsibility.

### 2. *The History and Characteristics of the Defendant*

The government's recommended sentence also accounts for the defendant's significant criminal history, his complete lack of remorse, and his continued attempts to lie and evade responsibility for his conduct.

The defendant's criminal conduct stretches back over a decade. He has four prior adult convictions, including for Attempted Assault with a Dangerous Weapon in 2009 and Robbery while Armed in 2013. His record clearly demonstrates that he is not amenable to supervision: he repeatedly failed to comply with his conditions of release in his 2009 conviction, leading to two revocations of release, and he committed the present offense while on supervision for his 2013 Robbery while Armed conviction – and did so less than two months after being released from incarceration. The defendant has had multiple prior opportunities to change his behavior, but instead, his criminal conduct has escalated, showing a total lack of deterrence by punishment.

Moreover, the defendant has failed to show any remorse or responsibility for raping J.S. He has persisted in lying about his conduct – to Kiara Price, the woman he stayed with in North Carolina while hiding from police; to law enforcement, in his custodial interview; and now to the Court, in his post-trial statements to the psychosexual evaluator – an interview that he requested, knowing that it would be provided to the Court. He continues to repeat the same false claim that J.S. was a sex worker who willingly entered his vehicle, to deny that he raped J.S., and to shift blame to Nick Savoy. The fact that the defendant continues to affirmatively present the false narrative that he has constructed – a narrative which was soundly rejected by the jury's verdict and

9

which is contradicted not just by the trial testimony, but also by video evidence – underscores his lack of remorse. He does not think that what he did to J.S. was wrong, or that he is deserving of punishment.

This attitude renders the defendant a serious, ongoing danger to the community. This conclusion is consistent with the assessment of the psychosexual evaluator, who determined that the defendant falls within the highest risk groups for both sexual and non-sexual violent recidivism, noting that "all of the risk instruments indicate a high risk of violence." Psychosexual Evaluation and Risk Assessment at 10. Indeed, the defendant's failure to take the evaluation seriously, as demonstrated by his "indiscriminate" answering of questions on tests administered by the evaluator, *id.* at 7, further shows the lack of respect that he has for the law and these proceedings.

The government recognizes the defendant's statements regarding his unstable and troubled childhood, and his claim that he was sexually abused as a seven-year-old by his twelve-year-old female cousin. However, this history does not explain or excuse his decision decades later, as a 29-year-old man, to kidnap and repeatedly rape a total stranger, nor does it lessen the dangerousness that he presents today. There is no information in either the Presentence Report or the Psychosexual Evaluation that would mitigate the horrific nature of the defendant's conduct, nor call for a lesser sentence than that recommended by the government.

In sum**,** the defendant's history and characteristics – including his record of prior violent offenses, repeated failure on supervision, lack of any remorse or acceptance of responsibility, and high risk of recidivism – all support the lifetime incarceration recommended by the government.

### 3. *Punishment, Deterrence, Protection, and Correction*

A sentencing court "shall impose a sentence sufficient, but not greater than necessary" to comply with the need for a sentence: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate

deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The government's recommended sentence is necessary in the context of this particular case. The defendant's conduct inflicted devastating harm on J.S. He targeted a complete stranger, who could have been any one of the thousands of women who walk home from the Metro after work every night. His crime was not borne of economic circumstances, drug addition, recklessness, or mental health concerns. He fundamentally believes that he is entitled to sex and that he can take it from a woman against her will. His failure to express any sort of remorse or responsibility for his conduct only further highlights his likelihood of reoffending.

The defendant has shown himself to be a dangerous sexual predator who will offend again if he is released. Allowing someone who is capable of this level of random, brazen, and violent conduct to remain in the community for any period of time is extremely dangerous. The recommended lifetime sentence not only incapacitates him from committing such behavior, but also punishes him appropriately for his conduct.

    4.  *Available Sentences and the Need to Avoid Unwarranted Disparities*

Section 3553(a)(6) directs courts to consider the need to avoid *unwarranted* disparities among defendants "with similar records who have been found guilty of similar conduct." However, it "does not require the district court to avoid sentencing disparities between defendants who might not be similarly situated." *United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018) (quoting *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010)).

Here, the U.S. Sentencing Commission's Judicial Sentencing Information does not have any information regarding the average sentence length for defendants sentenced under U.S.S.G. § 2A4.1 with Criminal History Category IV and a final offense level of 40, due to an insufficient

11

number of defendants with these factors. Two cases from this District in which the defendants were convicted of similar charges, however, are instructive. In *United States v. Darin Moore et al*, 18-CR-198, the four defendants were convicted at trial of federal kidnapping and first-degree murder. In that case, the defendants kidnapped the victim, shot him, and demanded ransom from his family. Judge Boasberg sentenced the defendants to life imprisonment on the kidnapping charges and 45 years on the murder charges, to run concurrently.[3] In *United States v. Jeremiah McCrimmon*, 19-CR-223, the defendant, a 21-year-old man, pled guilty to kidnapping (federal) and sexually abusing his 13-year-old step-niece. The defendant had a criminal history score of zero and a federal guideline range of 188—235 months' imprisonment (240 months mandatory minimum) on the lead kidnapping charge, and 144-288 months' imprisonment on the sexual abuse charge. Judge Kelly sentenced the defendant to a total sentence of 384 months of incarceration followed by lifetime supervised release.

These cases illustrate the significant periods of incarceration that are warranted for offenses such as those committed by the defendant. Here, given the horrific nature of the defendant's actions, his prior criminal history, his continued failure to accept responsibility, and the extreme danger he poses to the community – particularly given the random nature of his offense and his lack of remorse – a lifetime sentence is appropriate.

     5.    *Restitution*

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C.

---

[3] Pursuant to 18 U.S.C. § 1201(a)(5), kidnapping resulting in death requires a statutory minimum sentence of life imprisonment.

Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*). Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which

an exact dollar amount is inherently incalculable." *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry"). Both statutes provide that, in the case of an offense resulting in the loss of property, the defendant pay an amount equal to the greater of the value of the property on the date of the loss or the date of sentencing. 18 U.S.C. §§ 3663(b)(1), 3663A(b)(1).

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or offenses "in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,"

*Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.

Restitution ordered under Section 3663 or Section 3663A "shall be issued and enforced in accordance with section 3664." 18 U.S.C. §§ 3663(d); 3663A(d). Because this case involves the related criminal conduct of two defendants, the Court has discretion to make each defendant liable for payment of the full amount of restitution, or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant. 18 U.S.C. § 3664(h).

Here, restitution applies under both 18 U.S.C. §§ 3663 and 3663A.[4] The government is seeking restitution in the amount of $1179, which reflects the combined total of the $180 stolen from J.S.'s bank account and the $999 value of her stolen iPhone X.[5] The government requests that the defendant be made liable for the full amount of restitution. This is not only in accordance with 18 U.S.C. § 3664(h), but also reflects the defendant's role as the initiator of the criminal conduct on the night of the offense. As discussed earlier, the defendant initially targeted J.S. and stopped the vehicle to rob her, including of her iPhone and bank card. Moreover, the defendant threatened to kill J.S. if she did not provide the men with the PIN code to her bank account, drove to her bank, and told Nick Savoy to take the money out of her account. Accordingly, J.S.'s losses are directly attributable to the defendant's conduct. Therefore, the government requests that the

---

[4] The defendant was convicted of subsections (a)(1) and (a)(2) of the D.C. Code First Degree Sexual Abuse while Armed statute, which involve the use or threatened use of force.

[5] *See* https://www.apple.com/newsroom/2017/10/iphone-x-available-for-pre-order-on-friday-october-27/, noting that the cost of the iPhone X was $999. The following model, the iPhone 11, was not issued until September 2019.

Court order him to pay $1179.00 in restitution under both 18 U.S.C. §§ 3663 and 3663A. The government will submit a proposed restitution order under separate cover.

## IV.  SUMMARY OF THE GOVERNMENT'S RECOMMENDED SENTENCE BY COUNT

To conclude, the government recommends the following sentence on each count:

- Count One: 240 months of imprisonment; five years of supervised release
- Count Two: Lifetime imprisonment
- Count Three: 216 months of imprisonment; five years of supervised release
- Count Four: 120 months of imprisonment; five years of supervised release
- Count Five: Life without Release
- Count Six: Life without Release

The government requests that all sentences run concurrent to one another.[6]

## V.  CONCLUSION

WHEREFORE, for all of the reasons discussed above, the government recommends that the Court sentence the defendant as discussed herein.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

　　/s/ Caroline Burrell
Caroline Burrell
Rachel Forman
Assistant United States Attorneys
601 D. St N.W., Washington, D.C. 20530
(202) 815-8613
caroline.burrell@usdoj.gov
rachel.forman2@usdoj.gov

---

[6] The government recognizes that the D.C. Voluntary Sentencing Guidelines state that at least one of the D.C. offenses must run consecutively; however, these guidelines are voluntary and, given that the government is requesting lifetime periods of incarceration, concurrent sentences are appropriate here.